PRESENT: All the Justices

MINH DUY DU

v. Record No. 151058

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE D. ARTHUR KELSEY
September 22, 2016

FROM THE COURT OF APPEALS OF VIRGINIA

Minh Duy Du pleaded guilty to statutory rape of his 13-year-old half-sister, aggravated

malicious wounding of his father, and malicious wounding of his stepmother. Du filed a petition

for appeal with the Court of Appeals, contending that the trial court abused its discretion by

ordering lifetime probation following his incarceration and by ordering no contact with the

victims as a condition of his suspended sentences. The Court of Appeals denied Du's petition

for appeal in a per curiam order, holding the trial court did not abuse its discretion. We agree

and affirm.

I.

Du was born in Vietnam. He never knew his father, who immigrated to the United States

when Du was a small child. When Du tuned 18, Du's father asked Du's mother to inform Du

that his father was in the United States and that he wanted Du to live with him, his wife, and their

young daughter. Du accepted the offer and traveled to the United States in 2009, having had no

previous relationship with his father, his father's wife, or their daughter. He did not know any of

them prior to his arrival in the United States. J.A. at 165.

At some point after his arrival, Du developed "a big grudge" against his father and

stepmother, "got really mad," and then "left" their home with no apparent intention of returning.

*Id.* at 127. Thereafter, in 2013, four years after Du's arrival to the United States, Du returned to

his father's home and entered through a window of his half-sister's bedroom. She was 13 years

old at that time. Du, then 22 years old, engaged in vaginal and oral sex with her.[1] When her mother discovered Du naked in her daughter's bedroom, her attempt to intervene led to a fight between Du, his stepmother, and his father. Du ended the episode by taking a metal baseball bat and striking his father and stepmother multiple times in their heads, knocking both unconscious. A portion of the attack was recorded by a surveillance camera the family had installed in their home. As they lay on the floor bleeding, Du told his half-sister, "They're dead." *Id.* at 69. When the stepmother unexpectedly regained consciousness, Du again struck her in the head with the baseball bat causing her to fall again to the floor unconscious.

Both Du's father and stepmother sustained serious injuries. His father was flown to a Roanoke hospital where a neurosurgeon stated that the father was in the process of "dying" due to his head injury. *Id.* at 70. Surgeons performed a craniotomy to remove a portion of the father's skull. His condition continued to worsen, and, as of the time of trial, Du's father was receiving full-time care at a nursing home and was "dependent on others for daily living activities." *Id.* His head injuries have severely damaged his cognitive capacities, leaving him at times unable to recognize his wife and daughter when they visit him.

Du's stepmother was also severely injured. The blows to her head from the baseball bat required 11 stitches to close the wound and extensive follow-up care. Since the attack, she has suffered from chronic panic attacks, emotional instability, insomnia, and a lingering sense of paranoia. She was unable to work as a tailor for three months during her recovery period and has incurred, along with her husband, non-reimbursable medical expenses.

---

[1] On brief, Du claims the sexual encounter was consensual. Documents presented to the trial court upon sentencing, however, included an interview with the child victim in which she stated that she unsuccessfully tried to "get out" of the room, hoping "he might let [her] go and wouldn't hurt [her]." J.A. at 127-28.

Prior to trial, Du wrote several letters to his father and stepmother attempting to obstruct the ongoing investigation of his charges and to keep them from testifying against him at trial. Stating that he had received advice from "other inmates," Du wrote:

> I am writing this quick letter in hopes and asking that you will *not answer the detectives' questions nor make a statement* and please *do not appear in court* on 1/22/14. That is the first day, after the second day, I *hope that mother will not appear*. Dear mother*, after 2 miss[ed] court appearances, the case will be dropped and the charges will be dismissed therefore the courts will let me go*. That is the first thing that I eluded [sic] to in my previous letters and the 1/22/14 date is closely approaching.
>
> . . . .
>
> I am writing this letter to you concerning the upcoming court appearance 1/22/14. . . . I am requesting that mother and father do *not answer the detectives' questions* prior to 1/22/14 and I am asking that mother and father do *not appear in court* on 1/22/14 until I can retain another attorney.
>
> . . . .
>
> I have asked a few other inmates and they said the best way for me to get an opportunity to return home to father and mother is 1. to ask mother *not to appear in court* on the first court date 1/22/14. The courts will appoint another date and if father and mother do *not appear again then the courts will dismiss the case*. 2. [I]f father and mother do appear in court and the courts ask you to recall the events, then all father and mother have to say is "I want PLEA TO THE 5th (fifth)" it is the right to *refuse to make a statement*. Just answer the questions pertaining to your address, name, birth date, social security number, etc. . . . *[I]f the courts or anyone ask you mother and father about the events or your health, the hospital or anyone ask about the events or any aspects pertaining to the situation, all father and mother have to say is "I want PLEA TO THE 5th" and I will do the same*. Except stating my name, age and address, I will also only respond, "I want PLEA TO THE 5th". Those [are] the words of advice from the inmates that have been incarcerated for a long time.
>
> . . . .
>
> [P]lease give me word that you will *not make accusations against me in court*. . . .

*Id*. at 87-90 (emphases added).

Du's father and stepmother did not respond to these letters. Nor did they take his several phone calls. His last letter expressed his ongoing dissatisfaction with her failure to comply with his demands: "At the court appearance you could have asked the courts to pardon me and request bond; however, you still have not granted me that request." *Id.* at 90.

Having failed in his attempt to pressure his father and stepmother into obstructing the prosecution, Du decided to plead guilty to statutory rape of his 13-year-old half-sister, aggravated malicious wounding of his father, and malicious wounding of his stepmother. At his sentencing hearing, the Commonwealth offered into evidence the victim impact statements, including one from Du's stepmother. The trial court received the victim impact statements and made them part of the evidentiary record. *See id.* at 156-58.

Du's counsel represented that the stepmother was present in the courtroom, but she was never called to testify at the sentencing hearing. Her victim impact statement, however, expressed her views clearly.[2] In her statement, she said that she remembered her daughter, immediately after the beating, pleading with Du to "leave immediately." Victim Impact Statement at 1.[3] Appearing "very calm," Du responded, "Don't panic, they are dead." *Id.* As the stepmother struggled to remain semi-conscious, she worried that she and her husband would both die and that their daughter "would fall into [Du's] hand." *Id.* "Ever since this incident," the stepmother explained, "I have lived in constant fear. Every day is a constant reminder of that horrible night." *Id.* She has had nightmares "every night" since the beating, and on "[m]any nights" she "can see [Du] beating [her] and taking a knife to slit [her] throat." *Id.* She

[2] The prosecutor brought the stepmother's victim impact statement to the attention of the trial court at various points in the sentencing hearing. *See, e.g., id.* at 156-58, 160, 166-67.

[3] The trial court sealed the victim impact statements, pursuant to Code § 19.2-299.1. To the extent that we mention facts found only in the sealed record, we unseal only those specific facts, finding them relevant to our decision in this case. The remainder of the previously sealed record remains sealed.

continued, "I constantly imagine that [Du] is hiding in the corners of the house and could jump out to beat and kill me." *Id.* This constant, chronic state of fear has left her "deteriorated" and "very discouraged." *Id.* at 2.

At no point in the stepmother's statement did she say anything that could be interpreted as a desire to have an ongoing relationship with Du. Exactly the opposite is true. The stepmother's statement reveals that Du's crimes against her, her husband, and her daughter have left her in a constant state of fearful panic at the very thought of Du.

At the sentencing hearing, the prosecutor confronted Du with "gruesome" pictures that he had drawn of a "mother and daughter who have been injured." J.A. at 163. The "mother's arm is hacked off, there's blood, there seems to be a lot of violence" portrayed in the picture, the prosecutor asserted. *Id.* In response, Du acknowledged his picture but explained he meant it only as a "story" of the "sacrifice of a mother for her child." *Id.*

Upon hearing the evidence and Du's allocution, the trial court stated that the "brutal beating" Du had given his father and stepmother was "beyond understanding." *Id.* at 169. The court found Du's attempt "to express shame or remorse" through his "huddled" demeanor wholly unbelievable. *Id.* The court imposed a sentence of life imprisonment on the aggravated malicious wounding charge, a 20-year sentence on the malicious wounding charge, and a 10-year sentence on the statutory rape charge. The active period of incarceration, after the court suspended portions of these sentences, required Du to serve 50 years in the penitentiary. The court placed Du, upon release from imprisonment, on probation for the remainder of his life.

Given the unique circumstances of the case, the trial court also conditioned Du's suspended sentences on the requirement that he have "no contact with any of the three victims." *Id.* at 170. After the court announced that condition, the prosecutor — unaccompanied by any

5

supportive remarks by Du's defense counsel — stated that Du's stepmother "requested that it not be ordered for her." *Id.* No other explanation was given. Nothing in the record, save this one sentence, discussed the point further.

Earlier in the sentencing hearing, Du's counsel had represented to the trial court that the stepmother was present in the courtroom. *Id.* at 165. At no point during the hearing, however, did she personally explain her view of the no-contact condition. Nor did the prosecutor offer any clarification of what the stepmother meant, why she felt that way, or how she came to that decision. The court, however, responded with its own clarification: "I don't want him to have any contact with her. . . . If she wishes to write him she can." *Id.* at 170. Du's counsel did not object to the court's ruling or make any response to it.

After the entry of the final sentencing order, Du filed a motion to reconsider seeking to undo the court's imposition of lifetime probation as well as the condition forbidding him from contacting the victims. Du's motion did not state that counsel had consulted his stepmother about the motion or that she joined in Du's requested relief. Nor did Du's stepmother seek leave to file any pleading on her own behalf. The court denied the motion to reconsider, holding that the severity of the crimes and the impact they had on the victims justified the sentencing conditions.

With respect to the no-contact condition, the court stated that it "discounted" the proffer made by the prosecutor concerning the stepmother's views. *Id.* at 225. The court "took into account the family dynamic" and again clarified that the no-contact condition did not bar the stepmother from contacting Du. *Id.* "The reason for this restriction," the court explained, "is that in earlier stages of the proceeding, [Du] communicated with the victims and attempted to entice them to fail to appear and to fail to cooperate with the prosecution." *Id.* at 226. The court

6

continued, "Such attempts are indicative to the Court that [Du] may attempt, at some point, to entice the victims to recant their stories or somehow affect the validity of [his] convictions." *Id.* The court also explained that it would "not attempt to pre-judge what might happen in the event of a violation" of the condition by Du. *Id.* at 225. The court stated that its "interest in protection of those victims and of society" was "not unreasonable" given the "horribly violent and unprovoked offenses," Du's persistent "attempts to obstruct the investigation and prosecution of the offenses," and Du's "demeanor at sentencing." *Id.* at 226.

Du filed a petition for appeal with the Court of Appeals, arguing that the trial court abused its discretion by ordering lifetime probation and imposing a no-contact condition on his suspended sentences. The Court of Appeals disagreed and issued a per curiam order denying Du's petition. We granted his petition for appeal to address both of his challenges to the trial court's sentencing order.

II.

A. THE ABUSE OF DISCRETION STANDARD

Criminal sentencing decisions are among the most difficult judgment calls trial judges face. The sometimes conflicting penological goals involved in such decisions defy precise measurements. Because this task is so difficult, it must rest heavily on judges closest to the facts of the case — those hearing and seeing the witnesses, taking into account their verbal and non-verbal communication, and placing all of it in the context of the entire case.

Such decisions — if within the lawful boundaries of applicable sentencing statutes and constitutional limitations — are vested in the sound discretion of trial judges, not appellate judges. *See generally* John L. Costello, Virginia Criminal Law and Procedure § 63.3[5], at 1113 (4th ed. 2008). In an indeterminate sentencing model "not subject to established criteria, except for the statutory framework that set its outer limits," an appellate court simply has no principled

7

"standards it could invoke to determine whether a particular sentence was excessive in length or otherwise inappropriate." 6 Wayne R. LaFave et al., Criminal Procedure § 26.3(g), at 945 (4th ed. 2015).

The same can be said for the constituent aspects of the trial court's sentencing decisions, such as those regarding the suspension of active sentences and the imposition of a term of probation. Code § 19.2-303 authorizes reasonable conditions upon the suspension of sentences, including any period of probation. Absent an alleged statutory or constitutional violation, "[t]he sole statutory limitation placed upon a trial court's discretion in its determination of such conditions is one of reasonableness." *Anderson v. Commonwealth*, 256 Va. 580, 585, 507 S.E.2d 339, 341 (1998) (citing *Dyke v. Commonwealth*, 193 Va. 478, 484, 69 S.E.2d 483, 486 (1952) (decided under predecessor statute)).

The reasonableness standard takes into account the "nature of the offense, the defendant's background, and the surrounding circumstances." *Murry v. Commonwealth*, 288 Va. 117, 122, 762 S.E.2d 573, 576 (2014). When exercising its discretionary power, however, the trial court "has a range of choice, and its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Lawlor v. Commonwealth*, 285 Va. 187, 212-13, 738 S.E.2d 847, 861 (2013) (alteration and citation omitted). The exercise of discretion thus presupposes "that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts — yet still remain entirely reasonable." *Thomas v. Commonwealth*, 62 Va. App. 104, 111, 742 S.E.2d 403, 407 (2013) (citation omitted). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Sauder v. Ferguson*, 289 Va. 449, 459, 771 S.E.2d 664, 670 (2015) (citation omitted).

8

It necessarily follows that an abuse of discretion cannot be shown merely because "[r]easonable trial judges and even some members of this Court, had they been sitting as trial judges in this case," might have reached a different conclusion than the one under review. *Coe v. Commonwealth*, 231 Va. 83, 88, 340 S.E.2d 820, 823 (1986). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Grattan v. Commonwealth*, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009) (citation omitted).[4]

## B. LIFETIME PROBATION

A Virginia trial court "clearly" acts within the scope of its sentencing authority "when it chooses a point within the permitted statutory range" at which to fix punishment. *Alston v. Commonwealth*, 274 Va. 759, 771, 652 S.E.2d 456, 463 (2007). In cases where the argument on appeal is simply a challenge to the duration of imprisonment, we have consistently held that the sentencing statutes define the outer boundaries of the bell-shaped curve of reasonableness. Consequently, "when a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Id.* at 771-72, 652 S.E.2d at 463 (quoting *Abdo v. Commonwealth*, 218 Va. 473, 479, 237 S.E.2d 900, 903 (1977)).[5] In this respect, our view adheres to the "general proposition that once it is determined that a sentence is within the limitations set forth in the statute under

---

[4] *See also AME Fin. Corp. v. Kiritsis*, 281 Va. 384, 393, 707 S.E.2d 820, 824 (2011) ("In evaluating whether a trial court abused its discretion, 'we do not substitute our judgment for that of the trial court.'" (quoting *Beck v. Commonwealth*, 253 Va. 373, 385, 484 S.E.2d 898, 906 (1997))); *Noll v. Rahal*, 219 Va. 795, 801, 250 S.E.2d 741, 745 (1979).

[5] *See also Williams v. Commonwealth*, 270 Va. 580, 584, 621 S.E.2d 98, 100 (2005); *Perry v. Commonwealth*, 208 Va. 283, 289, 156 S.E.2d 566, 571 (1967). Criminal convictions, however, still remain subject to review and modification by the Governor consistent with his executive clemency powers. *See* Va. Const. art. V, § 12; Code § 53.1-229.

which it is imposed, appellate review is at an end." *Dorszynski v. United States*, 418 U.S. 424, 431 (1974).

In this case, the statutory maximum sentences applicable to Du's three criminal convictions — aggravated malicious wounding of his father, malicious wounding of his stepmother, and statutory rape of his half-sister — added up to life imprisonment plus 30 years. If the trial court had imposed a life sentence, Du's claim that the sentences were excessive would necessarily fail. Because the imposition of lifetime probation is far less severe than life imprisonment, *a fortiori*, Du's claim that the imposition of lifetime probation was excessive likewise fails. We thus reject Du's challenge that the trial court's decision to order lifetime probation, following Du's 50 years of active incarceration, constituted an abuse of discretion.[6]

## C. NO-CONTACT CONDITION

Du next contends that the trial court abused its discretion in ordering him, as a condition of his suspended sentences, not to contact his victims.[7] We will address this argument only as it

---

[6] One of the three crimes Du committed was statutory rape of his 13-year-old half-sister. As we have emphasized, "the Commonwealth has the legitimate concern that a probationer is more likely to engage in criminal activities than an ordinary citizen. This concern is heightened when, as here, a probationer is a sex offender." *Murry*, 288 Va. at 127, 762 S.E.2d at 579 (citation omitted). We have also recognized "elevated public safety concerns with 'the crime of child molestation,' which all too often goes unreported." *Id.* (citation omitted).

[7] Du also argues that the no-contact provision in Code § 19.2-303 relating to gang members "preclude[s] the finding that a prohibition on contact between non-gang members could be reasonable" because the gang provision "prohibits members of a criminal street gang from being barred from contact with members of their family or household who may be fellow gang members unless the trial court makes a specific finding that such a prohibition is necessary." Appellant's Br. at 12-13. Du attempts to invoke the negative-implication canon, *expressio unius est exclusio alterius*. We find it inapplicable. Code § 19.2-303 permits the suspension of sentences "under such conditions as the court shall determine," and "[t]he sole statutory limitation placed upon a trial court's discretion in its determination of such conditions is one of reasonableness." *Anderson*, 256 Va. at 585, 507 S.E.2d at 341. It is thus "clearly apparent . . . that the legislature did not in fact intend that its express mention of one thing should operate as an exclusion of all others," and the *expressio unius est exclusio alterius* "maxim must give way."

10

relates to his stepmother.[8]  We agree with the Court of Appeals that Du's argument on this issue is meritless.

The trial court ordered the no-contact condition after taking "into account the family dynamic" and recalling the "earlier stages of the proceeding" in which Du "communicated with the victims and attempted to entice them to fail to appear and to fail to cooperate with the prosecution."  J.A. at 225-26.  Among the court's concerns was that Du might later attempt to entice the victims into recanting in hopes of manufacturing some basis for challenging his conviction.  *Id.* at 226.

Addressing directly the no-contact condition as it applied to the stepmother, the court expressly "discounted" the prosecutor's proffer of the stepmother's wishes and correctly observed that it was not binding.  *Id.* at 225.  The court did not elaborate on the specific reason for discounting the proffer.  We need not determine the precise reason, however, because we may rely upon any reasonable basis in the record that supports the trial court's decision.  *See Haynes v. Haggerty*, 291 Va. 301, 305, 784 S.E.2d 293, 294 (2016) (upholding a judgment on grounds evident in the record though not specifically relied upon by the trial court).  In this respect, our appellate review "is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling."  *Perry v. Commonwealth*, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010) (quoting *Bolden v. Commonwealth*, 275 Va. 144, 147, 654 S.E.2d 584, 586 (2008)); *see also Commonwealth v. Jenkins*, 255 Va. 516, 522, 499 S.E.2d 263, 266 (1998).

---

Henry Campbell Black, Handbook on the Construction and Interpretation of the Laws § 72, at 220 (2d ed. 1911).

[8] In the trial court, Du limited his challenge to the no-contact condition only as it applied to his stepmother.  *See* J.A. at 222 (addressing only the "imposition of a lifetime ban on contact with the stepmother").  We thus do not address his argument on appeal to the extent applicable to his father or his half-sister.  *See* Rule 5:25.

The record provides ample grounds for the trial court's decision to discount the prosecutor's proffer of the stepmother's wishes. At the time the proffer was made, the court was aware that the stepmother had exercised her statutory right to submit a victim impact statement (handwritten in Vietnamese by the stepmother and translated into English by an interpreter) for the very purpose of providing her input into the court's sentencing decision. *See* Code § 19.2-11.01(A)(4)(a). That lengthy written statement detailed the following for the court:

- As the stepmother struggled to remain semi-conscious during Du's beating, she worried that she and her husband would both die and that their daughter "would fall into [Du's] hand." Victim Impact Statement at 1.

- "Ever since this incident," the stepmother explained, "I have lived in constant fear. Every day is a constant reminder of that horrible night." *Id.*

- She has had nightmares "every night" since the beating, and on "[m]any nights" she "can see [Du] beating [her] and taking a knife to slit [her] throat." *Id.*

- She "constantly imagine[s] that [Du] is hiding in the corners of the house and could jump out to beat and kill [her]." *Id.*

- This constant, chronic state of fear has left her "deteriorated" and "very discouraged." *Id.* at 2.

At no point in the stepmother's statement did she express a desire to have an ongoing relationship with Du. To the contrary, her statement reveals that his crimes have left her in a constant state of fearful panic at the very thought of him. It seems improbable that the prosecutor's brief proffer could ever be persuasively reconciled with the stepmother's statement that she "constantly imagine[s] that [Du] is hiding in the corners of the house" ready to "jump out to beat and kill" her. *Id.* at 1.

Given the weakness of the prosecution's proffer and the strength of the stepmother's victim impact statement, a trial court exercising its sound discretion could conclude that the

12

stepmother was uniquely vulnerable to the possibility that Du would try to "entice" her to "recant" in support of his likely challenge to the "validity" of his convictions. J.A. at 226.[9] Du had earlier attempted to manipulate her into abandoning the prosecution. It was quite reasonable for the court to infer that Du might continue that same effort during his many years of imprisonment. Like the Court of Appeals, we see no principled basis to declare the trial court's decision on this issue to be an abuse of discretion.[10]

### III.

In sum, we find no merit in Du's challenge of his lifetime probation and the no-contact condition of the sentencing order. We thus affirm the judgment of the Court of Appeals upholding the trial court's sentencing order.

*Affirmed.*

JUSTICE POWELL, concurring in part and dissenting in part.

This is a horrible case which might tempt reasonable jurists to do things that they might not ordinarily do. I agree with the majority that the trial court did not abuse its discretion in

---

[9] Other state courts have held no-contact conditions to be reasonable for analogous reasons. *See, e.g.*, *People v. Jungers*, 25 Cal. Rptr. 3d 873, 878-79 (Cal. Ct. App. 2005) (upholding a condition of no contact with the victim as reasonable because of "[t]he state's compelling interest in protecting victims of domestic violence"); *West v. State*, 287 S.E.2d 694, 695-96 (Ga. Ct. App. 1982) (holding a no-contact condition with victims of crimes to be reasonable); *State v. Perfetto*, 7 A.3d 1179, 1183 (N.H. 2010) (holding a condition of no contact with children for defendant convicted of child pornography to be reasonable because it "provides protection to the class of individuals exploited by him and furthers his rehabilitation by limiting the circumstances which could lead to his reoffending").

[10] The trial court's no-contact condition — like our opinion affirming it — should not be interpreted too broadly. The fact that, at some later revocation hearing, a trial court might determine that a condition on a suspended sentence has been breached does not ipso facto mean that all or part of the suspended sentence necessarily will be revoked. It means only that the suspension may be vacated to whatever degree the circumstances of the violation warrant. The trial court in this case understood this point, explaining that it would "not attempt to pre-judge what might happen in the event of a violation" of the condition by Du. J.A. at 225.

13

ordering lifetime probation. I also agree with the majority that a criminal sentencing is among the most difficult judgment calls that a trial court faces. I am aware of the high hurdle imposed by an abuse of discretion standard and wholly subscribe to the notion that, in most cases, it is the trial judge in the courtroom who is best suited to make many decisions, not the least of which is a sentencing decision. Finally, I agree with the majority that, when it comes to the appeal of a sentencing order, an appellate court should tread with great care. It is against this backdrop of understanding that I simply cannot agree with the majority's analysis of the no-contact condition. While I can understand why one might wish to impose a no-contact condition in this case, in my opinion when the record is properly evaluated, the imposition of the no-contact condition with regard to the stepmother was an abuse of discretion.[1] Accordingly, I respectfully dissent.

Code § 19.2-303 provides that "[a]fter conviction . . . the court may suspend imposition of sentence or suspend the sentence in whole or part and in addition may place the defendant on probation under such conditions as the court shall determine." This Court has recognized that Code § 19.2-303 provides trial courts with significant latitude in the terms and conditions that may be imposed, subject to a single limitation: the terms and conditions must be reasonable. *Anderson v. Commonwealth*, 256 Va. 580, 585, 507 S.E.2d 339, 341 (1998). However, the question of reasonableness cannot be determined in a vacuum. Indeed, conditions that are reasonable in one case may be wholly inappropriate for another. Accordingly, we have recognized that the imposed conditions "must be reasonable in light of the nature of the offense, the defendant's background, and the surrounding circumstances." *Murry v. Commonwealth*, 288 Va. 117, 122, 762 S.E.2d 573, 576 (2014). Additionally, because the principles of suspension

---

[1] I agree with the majority that, having limited his challenge to the no-contact condition as it applied to his stepmother, Du has waived any challenge to the no-contact condition as it applies to his father and half-sister. *See* Rule 5:25.

14

and probation provide remedial tools to use in the rehabilitation of criminals and the protection of the community, logic dictates that the imposed conditions must also be "'reasonably related to rehabilitation . . . and to the deterrence of future criminal conduct.'" *Id.* (quoting *Jones v. State*, 41 P.3d 1247, 1258 (Wyo. 2002)). *See also United States v. Kebodeaux*, 570 U.S. ___, ___, 133 S. Ct. 2496, 2504 (2013) (noting that the "principal purposes of postrelease conditions are to rehabilitate the convict, thus preventing him from recidivating, and to protect the public"); *Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987) ("[R]estrictions [imposed by a court] are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large."); *Peyton v. Commonwealth*, 268 Va. 503, 508, 604 S.E.2d 17, 19 (2004) ("Statutes that permit the trial court to impose alternatives to incarceration, such as probation or conditionally suspended sentences, are highly remedial and should be liberally construed to provide trial courts valuable tools for rehabilitation of criminals.").

"We review conditions of probation imposed by a trial court as part of its sentencing determination for abuse of discretion." *Murry*, 288 Va. at 122, 762 S.E.2d at 576.

> A trial court abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; [or] when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment."

*Id.*, 288 Va. 117, 122, 762 S.E.2d 573, 576 (2014) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011)).

In the present case, the majority asserts that the trial court's decision was reasonable because "a trial court exercising its sound discretion could conclude that the stepmother was uniquely vulnerable to the possibility that Du would try to 'entice' her to 'recant' in support of

his likely challenge to the 'validity' of his convictions." In coming to this conclusion, the majority never fully considers the most relevant factors: whether the no-contact condition is "reasonable in light of the nature of the offense, the defendant's background, and the surrounding circumstances" or whether the no-contact condition is "'reasonably related to rehabilitation . . . and to the deterrence of future criminal conduct.'" *Murry*, 288 Va. at 122, 762 S.E.2d at 576 (quoting *Jones*, 41 P.3d at 1258).

When viewed in light of the *Murry* factors, it appears to me that the no-contact condition was unreasonable and, therefore, the trial court abused its discretion. The record demonstrates that Du only has a significant bond with three people in this country: his father, his stepmother and his half-sister. Of those three, only his stepmother expressed her desire to allow contact with Du. To effectively isolate Du from the only person in this country who has a significant bond with him *and* who has affirmatively indicated that she wishes to remain in contact with him[2] is, in my judgment, unreasonable.[3]

Furthermore, it cannot be said that the no-contact condition serves any rehabilitative purpose. Such a ban does not, in any way, promote good behavior or deter Du from future

---

[2] Although the majority characterizes the Commonwealth's proffer of the stepmother's request to allow Du to contact her as weak, it is only relevant that the request was unequivocally made. Similarly, whether the request can be reconciled with the victim impact statement is not particularly relevant to whether the no-contact condition was reasonable.

[3] To be clear, I am not saying that the no-contact condition is patently unreasonable simply because the stepmother requested that Du be allowed to have contact with her. Rather, my analysis is limited to the facts of this case. Here, it is the combination of the stepmother's request and her awareness of the fact that Du shares a significant relationship with a particularly small group of individuals due to his background that makes this condition unreasonable.

I am also persuaded by the fact that this condition will similarly isolate the stepmother. As her victim impact statement points out, she speaks limited English and she has few friends or relatives in this country. While in no way discounting the horror of the encounter, in my opinion the trial court should have given her wishes the appropriate consideration. Although I cannot say that the trial court gave her wishes no consideration, it is apparent that the stepmother's request was given less consideration than other, less relevant factors.

16

crimes. Nor can it be said that it protects the public or his stepmother. Indeed, Du will remain incarcerated for a minimum of 50 years regardless of whether he has contact with his stepmother, thereby ensuring the safety of the public and his stepmother.

Instead of considering the *Murry* factors, the majority simply examines whether the trial court's rationale for imposing the no-contact condition was logical and, finding that it was, concludes that the condition was reasonable. However, in so doing, the majority overlooks the peculiar circumstances of this case, namely that the trial court based its rationale on a possibility that cannot come to pass under our jurisprudence. According to the trial court, the reason that it imposed the no-contact condition is because

> in earlier stages of the proceeding, [Du] communicated with the victims and attempted to entice them to fail to appear and to fail to cooperate with the prosecution, even going so far as to tell them to "take the 5th." Such attempts are indicative to the Court that [Du] may attempt, at some point, to entice the victims to recant their stories or somehow affect the validity of [Du'] convictions.

I recognize that, in light of Du's earlier attempts to convince the victims to not testify or cooperate with the prosecution, the trial court's concern that Du would engage in further attempts to manipulate his stepmother was certainly justified. At the same time, however, the facts of this case demonstrate that any concern the trial court may have about such manipulation affecting the validity of Du's conviction in any way is clearly misplaced. We have recognized that "recantation evidence is generally questionable in character and is widely viewed by courts with suspicion because of the obvious opportunities and temptations for fraud. Unless proven true, recantation evidence merely amounts to an attack on a witness' credibility by the witness herself." *Carpitcher v. Commonwealth*, 273 Va. 335, 346, 641 S.E.2d 486, 492 (2007) (citations omitted). Given the fact that Du confessed to committing the crimes that he ultimately pled guilty to, and that his confession is corroborated by evidence that does not rely on any victim

17

testimony (e.g., the video evidence of Du attacking his father and stepmother and the DNA evidence indicating sexual contact with his half-sister), it is highly unlikely that he could prove the truth of any recantation evidence. Thus, even if the trial court's concern was realized and Du was able to manipulate all three victims into recanting their stories, it would have no effect on the validity of his conviction. In other words, it appears to me that the trial court based its decision on a factor that was entirely irrelevant. This is one way in which we have acknowledged that a trial court commits an abuse of the considerable discretion afforded it. *Murry*, 288 Va. at 117, 762 S.E.2d at 576; *Landrum*, 282 Va. at 352, 717 S.E.2d at 137.

Having determined that the trial court failed to consider the relevant factors (i.e., the *Murry* factors) and gave significant weight to improper or irrelevant factors (i.e., speculation that Du might try to manipulate his stepmother into recanting), I would find that the trial court abused its discretion in imposing the no-contact condition with regard to Du's stepmother. I, therefore, would reverse the judgment of the Court of Appeals upholding the trial court's sentencing order and remand the matter for resentencing.

18